IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Joseph M. Brown, | ) | C/A No.: 1:15-3686-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable R. Bryan Harwell, United States District Judge, dated February 5, 2016, referring this matter for disposition. [ECF No. 8]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 7].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On March 13, 2014, Plaintiff filed an application for DIB in which he alleged his disability began on November 8, 2013. Tr. at 147–48. His application was denied initially and upon reconsideration. Tr. at 84–87 and 89–94. On December 3, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Edward T. Morriss. Tr. at 39–55 (Hr'g Tr.). The ALJ issued an unfavorable decision on January 28, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 26–38. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–7. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 16, 2015. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 57 years old at the time of the hearing. Tr. at 42. He completed high school and one year of college. *Id.* His past relevant work ("PRW") was a vascular lead technician. Tr. at 197. He alleges he has been unable to work since November 8, 2013. Tr. at 147.

2.    Medical History

Plaintiff presented to the emergency room ("ER") at the Milwaukee Veterans Affairs Medical Center ("VAMC") on June 8, 2013, with a complaint of back pain. Tr. at 378. Two days later, he presented to nurse practitioner Terrence A. Hess ("Mr. Hess"),

and reported that he had recently injured his head, low back, and right elbow when he fell off a Stairmaster. Tr. at 326. He stated he exacerbated his pain while assisting a patient. Tr. at 326–27. Mr. Hess observed that Plaintiff ambulated without an assistive device; had 5/5 bilateral lower extremity strength; was able to flex his back; and had no point tenderness or bulging over his lumbar spine. Tr. at 328. Plaintiff expressed frustration that his primary care physician had recently cut his Methadone dosage in half. *Id.* Mr. Hess discussed with Plaintiff other ways to treat chronic back pain and declined to increase his dosage of Methadone. *Id.*

Plaintiff also presented to the ER on June 10, 2013. Tr. at 362–66. Staff physician David Tennenbaum, M.D. ("Dr. Tennenbaum"), indicated the following:

> Patient has taken an increase in number of methadone and he has used up his prescription in advance of the next available prescription renewal. Patient has returned to the emergency room repeatedly seeking pain medication and has attempted to receive medication through his primary care clinic without success. Patient also notes his persistent uncontrolled pain which [impairs] his ability to function. Patient is requesting an [interim] supplemental prescription until his next prescription is available on June 16.

Tr. at 364. Dr. Tennenbaum issued a supplemental prescription for Methadone until June 16. Tr. at 366.

On June 20, 2013, Dennis J. Maiman, M.D., Ph. D. ("Dr. Maiman"), wrote a letter to John T. Fish, III, M.D. ("Dr. Fish"), in which he explained that he had performed a lumbar fusion surgery on Plaintiff's back in 2005. Tr. at 273–74. He stated Plaintiff had done well for several years, but began experiencing pain in his back and leg again in 2011. Tr. at 273. He indicated Plaintiff complained of difficulty walking long distances, standing for long periods, and standing without bending. *Id.* He stated Plaintiff indicated

3

the pain radiated from his buttocks through his right leg. *Id.* Dr. Maiman indicated Plaintiff demonstrated diminished lumbar range of motion ("ROM"), severe paravertebral tenderness, and decreased ankle jerk. *Id.* He stated the last magnetic resonance imaging ("MRI") available for review was performed two years earlier and showed some mild stenosis above the fusion. *Id.* He stated he had advised Plaintiff to maintain or resume normal activities and to avoid bedrest. *Id.* He indicated he emphasized stress management, postural correction, frequent repositioning, and cardiovascular conditioning. *Id.* He stated he would refer Plaintiff for a new MRI. Tr. at 274.

On July 3, 2013, an MRI of Plaintiff's lumbar spine showed mild reversal of lumbar lordosis with mild grade I spondylolisthesis at the L2-3 level; unchanged degenerative disc disease and advanced facet degeneration at the L2-3 level with moderate stenosis of the spinal canal and mild narrowing of the neural foramina, left greater than right; stable modest degenerative changes elsewhere in the lumbar spine with no significant narrowing of the canal or foramina; and stable postsurgical changes at the L4-5 and L5-S1 levels. Tr. at 276–77.

Plaintiff was referred to the ER at the Milwaukee VAMC on July 10, 2013, after an EKG in the vascular lab showed him to have a heart rate in the 180s and he endorsed dizziness, palpitations, and shortness of breath. Tr. at 351. He admitted that he had been using his Methadone more frequently than prescribed and stated he had been out of the medication for a few days. Tr. at 353. He indicated he was unable to refill his prescription until July 16 and requested that he be given additional Methadone. *Id.* Harold Glenn

Lenett, M.D., assessed supraventricular tachycardia, hypertension, and chronic low back pain with drug seeking behavior. Tr. at 358.

Dr. Maiman wrote a second letter to Dr. Fish on July 25, 2013. Tr. at 275. He explained that the MRI showed stenosis at L2-3 and L3-4 that resulted from a bulging disc and facet arthropathy. *Id.* He indicated that he had discussed with Plaintiff the possibility of additional surgery for further decompression and stabilization and had told Plaintiff that the surgery would require a two-day hospitalization, six weeks in an orthosis, and a rehabilitation program. *Id.* He stated he had discussed the risks with Plaintiff and had informed him that improvement was likely, but not guaranteed. *Id.* Dr. Maiman indicated Plaintiff informed him that he would soon be moving and that he had offered to refer Plaintiff to a surgeon in Charleston. *Id.*

On August 8, 2013, Plaintiff presented to the ER at Pro Health Care with a complaint of back pain after sustaining a fall while playing Frisbee. Tr. at 288. Elizabeth Hawkins, PA-C ("Ms. Hawkins"), observed Plaintiff to have midline tenderness down his lumbar spine and premature tenderness in his right side. Tr. at 289. She noted that Plaintiff walked with a slight limp on his right side. *Id.* Ms. Hawkins prescribed Percocet and instructed Plaintiff to follow up with his primary care physician or neurosurgeon. Tr. at 290.

On August 26, 2013, Daniel Haller, M.D. ("Dr. Haller"), indicated Plaintiff's Methadone dosage was decreased from 40 milligrams twice a day to 10 milligrams twice a day and that Plaintiff rarely had to take an additional dose. Tr. at 346. He noted Plaintiff's blood pressure was elevated and prescribed Lisinopril/Hydrochlorothiazide

20/12.5 milligrams twice a day. Tr. at 346 and 347. He recommended Plaintiff continue to attempt to lose weight. Tr. at 347.

Plaintiff presented to Katya Pontzloff, M.D. ("Dr. Pontzloff"), at the Charleston VAMC for an initial primary care visit on November 26, 2013. Tr. at 466–70. He reported chronic daily low back pain that was associated with activities that included riding a bike and bending to pick up objects. Tr. at 467. He stated he could walk and climb stairs, but was unable to run or jog. *Id.* He indicated he took 15 milligrams of Methadone daily and used a transcutaneous electrical nerve stimulation ("TENS") unit. *Id.* Dr. Pontzloff observed that Plaintiff had decreased ROM of his lumbar spine and tenderness in his paraspinal region, but had normal strength, reflexes, gait, and balance. Tr. at 470.

Plaintiff walked in to the nurse clinic at the Charleston VAMC on December 2, 2013. Tr. at 462–64. He indicated that he typically took three to four Methadone five milligram tablets twice a day, but was last prescribed five milligrams of Methadone to be taken three times daily. Tr. at 463. He complained of pain that he rated as a five on a 10-point scale and described it as radiating down his lower extremity and into his toes. *Id.* Dr. Pontzloff indicated Plaintiff could take three of the five milligram tablets twice a day. Tr. at 464.

Dr. Pontzloff contacted Plaintiff on December 3, 2013, to discuss his test results. Tr. at 460. She indicated Plaintiff's hemoglobin A1c was elevated at 6.6 and his vitamin D level was low at 17. Tr. at 460. Plaintiff indicated he had started taking Oscal D for his vitamin D and was interested in the MOVE weight management program. *Id.* Dr.

Pontzloff indicated she would reevaluate Plaintiff's lab results in six months to determine if additional medications were needed. *Id.*

On December 27, 2013, Plaintiff contacted the Charleston VAMC to request an early renewal of Methadone. Tr. at 456. He stated he had fallen down the stairs backwards and was taking four Methadone pills per day instead of three. *Id.* Dr. Pontzloff authorized Plaintiff to receive an early refill of Methadone. Tr. at 455.

Plaintiff contacted the Charleston VAMC on January 17, 2014, regarding his Methadone dosage. Tr. at 450. He indicated he was not receiving a dose equivalent to the amount he had been prescribed at the Milwaukee VAMC. *Id.* He indicated his doctor in Milwaukee had last prescribed 20 milligrams of Methadone twice a day and that he had previously been prescribed 40 milligrams of Methadone twice a day. *Id.* He stated he had been prescribed 15 milligrams twice a day in Charleston, but he had continued to take 20 milligrams twice a day and was almost out of Methadone. Tr. at 450–51. He requested that he be allowed to pick up more Methadone at his previous dosage. Tr. at 451.

Plaintiff contacted the Charleston VAMC on February 5, 2014, to request that he be allowed to pick up his Methadone prescription on February 13. Tr. at 449. Medical support assistant Vontella Smith informed Plaintiff that the Methadone prescription was for 28 days only and required a written renewal. *Id.* Dr. Pontzloff subsequently authorized Plaintiff to receive an early refill. Tr. at 450.

On February 28, 2014, Plaintiff again contacted the Charleston VAMC to request that his prescription for Methadone be refilled early. Tr. at 447–48. He stated he was leaving town on March 11 and requested that he be allowed to pick up his prescription on

March 10. Tr. at 448. Dr. Pontzloff returned Plaintiff's call on March 6, 2014. Tr. at 445–46. Plaintiff indicated he was leaving for New York City on March 8 and would be gone for three weeks. Tr. at 445. Dr. Pontzloff explained to Plaintiff that he could not obtain early refills every time. *Id.* She authorized Plaintiff to receive the early refill, but stated he would not be eligible for another refill until April 7. Tr. at 445–46.

Plaintiff contacted the Charleston VAMC on March 25, 2014, to request that he be allowed to pick up his prescription for Methadone on April 5, 2014 "because pt is commuting for his job and needs medication to take with him." Tr. at 443. Simon V. Scalia, M.D. ("Dr. Scalia"), authorized Plaintiff to pick up the prescription on April 4. Tr. at 444.

Plaintiff contacted Dr. Scalia by telephone on April 23, 2014, and reported that he was concerned about his inability to get a job in ultrasound. Tr. at 438. He indicated he would be leaving town for work on May 1 and requested that he be allowed to pick up his prescription for Methadone on either April 29 or 30. *Id.*

Plaintiff followed up with Dr. Scalia on May 20, 2014. Tr. at 430. Dr. Scalia indicated Plaintiff was "traveling alot for work as US tech eating salty food not able to lose weight." *Id.* Plaintiff reported stiffness and back pain that radiated to his right leg. Tr. at 431. He also endorsed a depressed mood. *Id.* Dr. Scalia noted Plaintiff had no spinal tenderness and a negative straight-leg raise test. Tr. at 432. He stated Plaintiff's hypertension was poorly controlled and that all his symptoms were exacerbated by weight gain. *Id.*

On June 5, 2014, state agency medical consultant Cleve Hutson, M.D. ("Dr. Hutson"), reviewed the evidence and assessed the following physical residual functional capacity ("RFC"): occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally climbing ramps/stairs, kneeling, crouching, and crawling; never climbing ladders/ropes/scaffolds; and must avoid concentrated exposure to hazards. Tr. at 62–65. On August 11, 2014, state agency medical consultant Larry Caldwell, M.D. ("Dr. Caldwell"), assessed the same physical RFC. Tr. at 75–77.

Plaintiff contacted the Charleston VAMC on June 11, 2014, to request an early refill of Methadone. Tr. at 514. He stated he would be out of town when the medication was due to be refilled on June 17, but would return in time for his appointment on June 23. *Id.* Dr. Scalia authorized the early refill, but indicated Plaintiff would not be eligible for another refill for 28 days after June 17. Tr. at 515.

Plaintiff presented for a social work triage assessment on June 13, 2014. Tr. at 509. He indicated he was injured in an automobile accident in March 2013 that exacerbated his back pain. Tr. at 510. He indicated he had been unemployed since November 2013 and was unable to find a job as an ultrasound technologist. *Id.* He stated his savings had been depleted; that he had a family of four that included two children ages 15 and 17; and that his family's only source of income was his wife's part-time job at Wal-Mart. *Id.* Plaintiff asked if he was eligible for any funds for medication or other assistance through the Department of Veterans Affairs ("VA"). *Id.* The social worker

indicated she would mail a prescription assistance form to Plaintiff and offered him contact information for local charities to help with bills. *Id.*

Plaintiff followed up with Dr. Scalia on July 2, 2014, and reported acute low back pain. Tr. at 505. He indicated he had a partial fall three to four weeks earlier, while he was working in Chicago. *Id.* Dr. Scalia observed Plaintiff to have paraspinal tenderness. Tr. at 507.

Anesthesiologist Robert S. Friedman, M.D. ("Dr. Friedman"), reviewed Plaintiff's record for a pain consultation on July 9, 2014. Tr. at 499–500. Dr. Friedman noted that Plaintiff had a "pattern of reporting falls for dose escalation and early refills." Tr. at 499. He noted that Plaintiff had been switched from 80 milligrams of Methadone per day to 40 milligrams per day. *Id.* He stated Plaintiff's pain control was ineffective with Methadone. *Id.* He recommended opioid education, a sleep study, testing of serum Methadone levels, rapid tapering from Methadone, participation in the MOVE program, tapering from Flexeril, aquatic therapy, and electrocardiogram ("EKG"). *Id.*

On July 10, 2014, Plaintiff presented to the ER at Charleston VAMC. Tr. at 493. He complained of increased low back pain, following a fall in his bathtub that occurred a week-and-a-half earlier. *Id.* Michael L. Taylor, M.D. ("Dr. Taylor"), observed Plaintiff to be tender to palpation over his left sacroiliac joint and to demonstrate a slightly antalgic gait, but he noted Plaintiff had normal strength and no edema. Tr. at 495. A nurse observed Plaintiff to have limited right ROM due to pain. Tr. at 496. Another nurse indicated Plaintiff ambulated with a steady gait, but had difficulty transitioning from a

standing to a sitting position. Tr. at 498. Dr. Taylor prescribed Lortab and instructed Plaintiff to keep his scheduled appointment with the neurosurgeon. Tr. at 495.

Plaintiff presented to physical therapist Janine M. Tumminia ("Ms. Tumminia"), for a physical therapy consultation on July 22, 2014. Tr. at 486–87. He reported that he had used a TENS unit in the past and that it was somewhat helpful. Tr. at 486. Ms. Tumminia indicated Plaintiff's active ROM was limited in his trunk and that he had reduced strength of 4–4+/5 in his bilateral lower extremities. *Id.* She issued a TENS unit and requested that Dr. Scalia refer Plaintiff for aquatic therapy for core and low back strengthening. Tr. at 487.

On July 30, 2014, psychologist Layne A. Goble, Ph. D. ("Dr. Goble"), provided a pain consultation after reviewing Plaintiff's medical record. Tr. at 486. Dr. Scalia requested the consultation based on possible psychosocial factors related to Plaintiff's chronic pain. Tr. at 485. He indicated Plaintiff was interested in pursuing non-opioid medications and aquatherapy. *Id.* Dr. Goble recommended Dr. Scalia consider having Plaintiff engage in cognitive behavioral therapy for chronic pain and pursue the MOVE program. *Id.* He indicated he supported Dr. Friedman's recommendation that Plaintiff be assessed for sleep apnea. *Id.*

Plaintiff followed up with Dr. Scalia for a primary care visit on September 2, 2014. Tr. at 592. Plaintiff stated he had not obtained a sleep study through the VAMC, but had scheduled a sleep study at a private physician's office. *Id.* He indicated he was eating more salads and had lost weight. *Id.*

On September 8, 2014,[1] Dr. Scalia indicated Plaintiff had an unsteady gait and authorized prosthetics to issue an orthotic cane. Tr. at 564–55.

On September 17, 2014, Plaintiff presented to social worker Adriel Brown ("Ms. Brown") to discuss his problems with maintaining stable housing. Tr. at 579–81. Plaintiff denied suicidal and homicidal ideation and auditory and visual hallucinations. Tr. at 580. He reported he was not working, but was seeking employment. *Id.* He indicated his wife worked part-time and that he had been unable to secure employment as an ultrasound technician since he moved from Milwaukee to South Carolina. *Id.* Ms. Brown noted no abnormalities on a mental status examination. Tr. at 580–81.

Plaintiff presented to social worker Tania Demaggio ("Ms. Demaggio") on October 22, 2014. Tr. at 605. He indicated he was notified that he would be evicted from his home if he failed to pay the rent by October 25. Tr. at 606. Ms. Demaggio reviewed possible assistance resources with Plaintiff. *Id.*

Plaintiff also followed up with Dr. Scalia on October 22, 2014. Tr. at 606–09. He complained of low back pain and financial stress. Tr. at 606. He indicated he underwent a sleep study and was diagnosed with obstructive sleep apnea. *Id.* Dr. Scalia noted Plaintiff was only able to perform the straight-leg raise test to 45 degrees on the right, but that he demonstrated normal gait and balance. Tr. at 609. He assessed poorly-controlled hypertension as a result of noncompliance; obstructive sleep apnea with a need to obtain

---

[1] Although the prosthetics request is dated September 8, 2014, and references an unsteady gait, it does not appear from the record that Dr. Scalia examined Plaintiff on this date. *See* Tr. at 564–65.

a CPAP machine; and obesity. *Id.* He advised Plaintiff to take his medications on a regular basis, but to start weaning off of Methadone. *Id.*

On November 7, 2014, Plaintiff contacted the Charleston VAMC to request that his pain medication be increased back to the regular dose as a result of increased pain. Tr. at 601. Dr. Scalia recommended that Plaintiff continue to take three-and-a-half Methadone tablets until closer to his prescription refill date. Tr. at 602. On November 19, 2014, Plaintiff requested an additional 12 Methadone tablets to hold him over until December 1. Tr. at 600.

A treatment note dated November 26, 2014, indicates Plaintiff was 6' tall and weighed 274.5 pounds. Tr. at 545. Plaintiff rated his pain as an eight out of 10. *Id.* Nurse Joseph C. Trevino ("Mr. Trevino"), administered a Toradol injection in Plaintiff's left gluteal region. Tr. at 570. Dr. Scalia prescribed Gabapentin. Tr. at 596. On November 26 and December 2, 2014, Mr. Trevino described Plaintiff as ambulating with a steady, stable gait; with a shortened stride and arm swing; and favoring his right leg. Tr. at 568 and 572.

Plaintiff submitted to the Appeals Council a letter from Dr. Scalia dated June 19, 2015, which specified that Dr. Scalia was treating him for post-laminectomy syndrome, hypertension, and diabetes. Tr. at 626. Dr. Scalia stated Plaintiff's ability to perform gainful employment was compromised by his inability to sit, stand, walk, kneel, or bend for more than 30 minutes at a time. *Id.* He indicated Plaintiff could not be employed in his PRW or any other daily job activity. *Id.*

C.     The Administrative Proceedings

1.     The Administrative Hearing

At the hearing on December 3, 2014, Plaintiff testified that he had undergone two back surgeries. Tr. at 43. He stated he had stopped working in November 2013 because his back pain prevented him from performing his job duties. *Id.* He specified that he had difficulty lifting his hand, leaning over patients, transporting patients from one point to another, and assisting patients as they transferred themselves from bed to chair. *Id.* He stated he had difficulty remaining awake while on the job. Tr. at 48. He indicated he had worked as an ultrasound tech for the past 20 years. Tr. at 43.

Plaintiff testified that he experienced pain from just above his buttocks through his bilateral legs. Tr. at 44. He indicated the pain was worse in his right leg. *Id.* He stated he experienced numbness in his foot that affected his abilities to stand and walk. *Id.* He indicated he experienced some numbness, tingling, and swelling in his right hand. Tr. at 47. He stated he had been diagnosed with diabetes. Tr. at 48. He indicated he had gained approximately 25 pounds since he stopped working. Tr. at 50.

Plaintiff testified that he could only walk for half a block before experiencing severe pain. Tr. at 44. He stated that he could not stand without leaning forward. *Id.* He indicated he could lift no more than five or six pounds. Tr. at 45. He stated his doctor had prescribed a cane and that he had used it to ambulate for the last three months. *Id.* He indicated he sometimes felt a pinching sensation in his lower back when he reached overhead with his right arm. *Id.* He endorsed some difficulty with pulling. *Id.*

Plaintiff testified that his doctor was trying to help him to avoid another surgery. Tr. at 45. He stated his doctor had recommended water therapy and had prescribed a brace, a TENS unit, and 20 milligrams of Methadone for pain. *Id.* Plaintiff stated his medications alleviated his pain to some extent, but he still assessed his pain as an eight on a 10-point scale. *Id.* He indicated his doctor had encouraged him to apply for disability benefits. Tr. at 48–49.

Plaintiff's attorney questioned him about references in the record to him requesting early medication refills. Tr. at 45–46. Plaintiff stated that he had been on 40 milligrams of Methodone before he moved from Milwaukee and that he was told that he could take two pills at a time when his pain was at its worst. *Id.*

Plaintiff testified that he attempted to perform activities during the day, but required help with putting on his clothing, shoes, and socks and with reaching some things while cooking. Tr. at 46. He stated he sometimes drove to the grocery store, but was unable to lift grocery bags or unload the shopping cart. Tr. at 46 and 49–50. He indicated he sometimes walked his dog and folded laundry. Tr. at 49.

Plaintiff testified that his medication sometimes made him drowsy. Tr. at 46–47. He indicated he had started a rehabilitation program, but that he was unable to continue it after he fell and injured himself in the shower. Tr. at 47.

2.    The ALJ's Findings

In his decision dated January 28, 2015, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2.    The claimant has not engaged in substantial gainful activity since November 8, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairment: degenerative disc disease status-post two surgeries (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he can occasionally climb ramps/stairs; can never climb ladders/ropes/scaffolds; can frequently stoop; can occasionally kneel, crouch, and crawl; and must avoid concentrated exposure to hazards.

6.    The claimant is capable of performing past relevant work as a vascular lead technician. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from November 8, 2013, through the date of this decision (20 CFR 404.1520(f)).

Tr. at 31–34.

### 3.    Appeals Council Review

#### a.    April 15, 2015 Notice

The Appeals Council issued a notice of action that denied Plaintiff's request for review and stated it found no reason under its rules to review the ALJ's decision. Tr. at 18.

#### b.    July 18, 2015 Notice

The Appeals Council issued a second notice of action that indicated it was setting aside its April 15, 2015 action to consider additional information. Tr. at 1. It explained that it had again denied Plaintiff's request for review because it found no reason under its rules to review the ALJ's decision. *Id.* The Appeals Council concluded that the additional evidence did not provide a basis for changing the ALJ's decision. Tr. at 2. It noted that it

had considered Plaintiff's allegation of bias on the part of the ALJ under the abuse of discretion standard in 20 C.F.R. § 404.970 and had determined there was no abuse of discretion and no other basis to grant review. *Id.*

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ disregarded Plaintiff's required use of a cane in determining that he was capable of meeting the exertional demands of light work;

2)    the ALJ erroneously gave little weight to Dr. Scalia's opinion;

3)    the ALJ did not adequately consider evidence that suggested Plaintiff's impairment met Listing 1.04;

4)    the ALJ improperly concluded that Plaintiff could perform his PRW as a vascular lead technician; and

5)    the ALJ did not properly evaluate Plaintiff's subjective symptoms.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[2]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*,

*Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Use of Cane

Plaintiff argues that the record includes unrebutted evidence that he required a cane to ambulate and that his use of a cane precludes him from performing light work. [ECF No. 15 at 13]. He maintains that an individual who requires a cane to ambulate cannot meet the standing, walking, and lifting requirements of light work. *Id.* at 14–15.

He contends that the ALJ never addressed or rejected the evidence of record that he needed a cane. [ECF No. 18 at 2].

The Commissioner argues that Dr. Scalia's treatment notes do not support Plaintiff's need for a cane and that Plaintiff testified that he only occasionally used a cane. [ECF No. 16 at 13 n.2]. She maintains that substantial evidence supports the ALJ's RFC finding. *Id.*

To properly assess a claimant's RFC, the ALJ must ascertain the limitations imposed by the individual's impairments and determine his ability to perform work-related physical and mental abilities on a regular and continuing basis. SSR 96-8p. The ALJ should consider all the claimant's allegations of physical and mental limitations and restrictions, including those that result from severe and non-severe impairments. *Id.* "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* The Fourth Circuit has held that "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful

review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The court's review of the record reveals evidence that supports the Commissioner's assertion that Plaintiff may not have required the use of a cane. *See* Tr. at 568 (steady and stable gait on November 26, 2014), 572 (steady and stable gait on November 26, 2014), and 609 (normal gait and balance on October 22, 2014). However, other evidence, including Plaintiff's testimony and the prescription issued by Dr. Scalia, suggested Plaintiff needed the cane to ambulate. *See* Tr. at 45 and 564–65. As the finder of fact, the ALJ was tasked with resolving the inconsistencies in the record and assessing Plaintiff's ability to perform relevant functions. *See Mascio*, 780 F.3d 636; SSR 96-8p. While the Commissioner asserts valid reasons the ALJ could have referenced to support a finding that a cane was not medically necessary, the law prevents the court from being swayed by her post hoc reasoning where the ALJ offered no recognition of the conflicting evidence. *See Hall v. Colvin*, No. 8:13-2509-BHH-JDA, 2015 WL 366930, at *11 (D.S.C. Jan. 15, 2015); *Cassidy v. Colvin*, No. 1:13-821-JFA-SVH, 2014 WL 1094379, at *7 n.4 (D.S.C. Mar. 18, 2014), citing *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

In *Hamlin v. Colvin*, No. 8:12-3601-RMG-JDA, 2014 WL 587464, at *13–14 (D.S.C. Jan. 23, 2014), *adopted by* 2014 WL 588073, this court similarly considered an ALJ's failure to acknowledge the plaintiff's use of a cane in assessing his RFC. The court

stated that "Appendix One (Listing of Impairments) of the regulations, however, provides that '[t]he requirement to use a hand-held assistive device may also impact on the individual's functional capacity by virtue of the fact that one or both upper extremities are not available for such activities as lifting, carrying, pushing, and pulling.'" *Id.*, citing 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00(J)(4). As in this case, the record in *Hamlin* contained conflicting evidence as to whether the plaintiff's cane was medically necessary. *Id.* The court concluded that "the ALJ's decision does not allow the Court to track the ALJ's reasoning and be assured that all record evidence was considered, and to understand how the ALJ resolved conflicts in the evidence. *Id.*, citing *McElveen v. Colvin*, No. 8:12-1340-TLW, 2013 WL 4522899, at *11 (D.S.C. Aug. 26, 2013). Based on the similarities between this case and *Hamlin*, the court is constrained to find that the ALJ's failure to acknowledge evidence that Plaintiff required a cane and to determine whether the cane was medically necessary resulted in an RFC finding that was not supported by substantial evidence.

### 2.    Treating Physician's Opinion

In a letter dated November 25, 2014, Dr. Scalia indicated he had treated Plaintiff for a chronic medical problem over the last year. Tr. at 542. He stated the condition limited Plaintiff's abilities to sit, stand, walk, kneel, or bend for more than 30 minutes at a time without aggravating his condition. Tr. at 542.

Plaintiff argues the ALJ erred in giving little weight to Dr. Scalia's opinion. [ECF No. 15 at 15]. He maintains the ALJ's finding that he could perform light work directly conflicted with Dr. Scalia's opinion that he could not sit, stand, walk, kneel, or bend for

more than 30 minutes at a time without aggravating his symptoms. *Id.* at 18. He contends that the ALJ neglected to explain how the objective evidence did not support Dr. Scalia's opinion. *Id.* He cites the July 2013 MRI and argues that it documented significant abnormalities and directed a recommendation for additional surgery. *Id.*

The Commissioner argues that Dr. Scalia's opinion is not supported by the objective medical evidence, which includes his own treatment notes. [ECF No. 16 at 10–11]. He maintains the opinion is also inconsistent with Plaintiff's reported daily activities. *Id.* at 12–13.

ALJs must consider all medical opinions of record. 20 C.F.R. § 404.1527(b). The regulations require that ALJs accord controlling weight to treating physicians' opinions that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p. If an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he is required to evaluate all the opinions of record based on the factors in 20 C.F.R. § 404.1527(c). *Id.* Those factors include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c).

A treating source's opinion generally carries more weight than any other opinion evidence of record, even if it not entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2). However, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). Medical opinions that are adequately explained by the medical source and supported by medical signs and laboratory findings should be accorded greater weight than uncorroborated opinions. 20 C.F.R. § 404.1527(c)(3). "[T]he more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004)[4]; *see also* 20 C.F.R. § 404.1527(c)(4).

The ALJ must give good reasons for the weight he accords to the treating source's opinion. SSR 96-2p. The notice of decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* However, it is not the role of this court to disturb the ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight

---

[4] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

The ALJ indicated he "accorded little weight to Dr. Scalia's opinion to the extent" he concluded that Plaintiff was "unable to perform substantial gainful activity" because his opinion was "unsupported by the treatment notes and other objective evidence of record." Tr. at 33. He further stated that Dr. Scalia's opinion was "primarily supported" by Plaintiff's subjective reports of pain as opposed to Dr. Scalia's clinical findings. *Id.* He stated the clinical findings that he discussed earlier in the decision indicated a higher level of functioning than Plaintiff subjectively reported. *Id.* The clinical findings cited by the ALJ earlier in the decision included Plaintiff's history of two spinal surgeries; his July 2013 MRI findings; an August 2013 ER visit after he was injured while playing Frisbee and x-rays from that visit; and progress notes from the Charleston VAMC that included complaints of daily back pain associated with activities such as riding a bike, running or jogging, climbing stairs, and bending to pick up objects" and physical examinations that showed him to be in no acute distress, to have some decreased ROM of the lumbar spine and paraspinal tenderness, to have normal strength and reflexes, and to have stable back pain on Methadone. Tr. at 32–33.

Although the ALJ did not explicitly perform a point-by-point analysis of the factors in 20 C.F.R. § 404.1527(c), his decision demonstrates that he considered all the relevant factors and accorded Dr. Scalia's opinion appropriate weight in light of the evidence of record. *See Hendrix v. Astrue*, No. 1:09-1283-HFF, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010) (holding that express discussion of the factors in 20 C.F.R. §

404.1527(c) is not required where a review of the ALJ's decision shows that he applied the relevant factors and gave appropriate weight to the medical opinion based on the evidence of record). In the absence of an indication that Dr. Scalia had any particular medical specialization, the ALJ did not err in neglecting to address the specialization factor. *See* 20 C.F.R. § 404.1527(c)(5). While the ALJ did not specifically discuss the examining and treating relationship between Plaintiff and Dr. Scalia, the fact that he referenced Dr. Scalia's clinical findings and general observations demonstrates that he considered those factors. *See* Tr. at 33.

The ALJ cited few objective findings from the period that Dr. Scalia treated Plaintiff, but the court's review of the record does not show his summary of Dr. Scalia's findings to be inaccurate or inadequate. The ALJ specified that the supportability factor weighed against Dr. Scalia's opinion because his opinion was more consistent with Plaintiff's subjective complaints than with his clinical findings. *See* Tr. at 33 (referencing Charleston VAMC records that showed Plaintiff to be in no acute distress and to have normal strength and reflexes, but to demonstrate some decreased ROM in his lumbar spine and paraspinal tenderness). It appears that Dr. Scalia examined Plaintiff during four visits between May 20 and October 22, 2014. *See* Tr. at 430, 505, 592, and 606. On May 20, 2014, Plaintiff complained of stiffness and back pain that radiated to his right leg, but Dr. Scalia observed no spinal tenderness and negative straight-leg raising test. Tr. at 430. On July 2, 2014, Plaintiff complained of acute low back pain after sustaining a fall, and Dr. Scalia observed paraspinal tenderness, but no other abnormalities. Tr. at 505. Dr. Scalia noted no abnormalities on September 2, 2014, but later indicated Plaintiff had an

abnormal gait when he ordered a cane on September 9, 2014. Tr. at 564–65 and 592. On October 22, 2014, Dr. Scalia noted normal gait and balance, but indicated Plaintiff could only perform the straight-leg raising test to 45 degrees on the right. Tr. at 609. In the absence of an explanation from Dr. Scalia as to the reasons for the assessed limitations to Plaintiff's abilities to sit, stand, walk, kneel, or bend, the court finds the ALJ appropriately referenced Dr. Scalia's relatively minor findings on examinations.

Finally, the ALJ specifically addressed the consistency factor in referencing his earlier recitation of the evidence and concluding that the functional limitations set forth by Dr. Scalia were inconsistent with the objective evidence. *See* Tr. at 32–33 (discussing the July 2013 MRI findings, the August 2013 physician's observations and x-ray findings, and observations of Dr. Scalia and the other VAMC physicians). Plaintiff argues that the MRI report, Dr. Maiman's letters, and the other VAMC physicians' findings corroborate Dr. Scalia's opinion, but the undersigned notes that none of these sources suggested Plaintiff was unable to sit, stand, walk, kneel, or bend for more than 30 minutes at a time and most indicated normal findings, aside from the decreased ROM, paraspinal tenderness, and MRI abnormalities that the ALJ acknowledged. *See* Tr. at 273 (Dr. Maiman indicated Plaintiff should resume normal activities and avoid bedrest), 276–77 (July 2013 MRI showed mild reversal of lumbar lordosis with mild grade I spondylolisthesis at L2-3; unchanged degenerative disc disease and advanced facet degeneration at L2-3 with moderate stenosis of the spinal canal and mild narrowing of the neural foramina, left greater than right; stable modest degenerative changes elsewhere in the lumbar spine with no significant narrowing of the canal or foramina; and stable

postsurgical changes at L4-5 and L5-S1), 328 (Mr. Hess indicated no abnormalities on examination), 346 (Dr. Haller stated Plaintiff had been prescribed a decreased dose of Methadone and his pain rarely required he take more), 470 (Dr. Pontzloff observed Plaintiff to have decreased lumbar ROM and paraspinal tenderness, but normal strength, reflexes, gait, and balance), 495 (provider in ER observed tenderness to palpation over Plaintiff's left sacroiliac joint and slightly antalgic gait, but normal strength and no edema), and 496 (ER provider noted limited right ROM).

In light of the foregoing, the court finds that the ALJ cited sufficient evidence to sustain his decision to accord little weight to Dr. Scalia's opinion.

### 3.    Listing 1.04

Plaintiff argues that records from Dr. Maiman and the VA physicians corroborate Dr. Scalia's opinion and suggest that his impairment may meet the requirements in paragraph A of Listing 1.04. [ECF No. 15 at 19–20]. The Commissioner argues that the evidence does not show that Plaintiff satisfied all the requirements of Listing 1.04. [ECF No. 16 at 14].

"A claimant is entitled to a conclusive presumption that he is disabled if he can show that his disorder results in compromise of a nerve root or the spinal cord." *Henderson v. Colvin*, --- F. App'x ---, 2016 WL 1320779, at *2 (4th Cir. 2016). "Listing 1.04(A) further describes the criteria a claimant must meet or equal to merit a conclusive presumption of disability arising out of compromise of a nerve root or the spinal cord: evidence of nerve root compression characterized by (1) neuro-anatomic distribution of pain, (2) limitation of motion of the spine, (3) motor loss (atrophy with associated muscle

29

weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, (4) positive straight leg raising test (sitting and supine)." *Id.*; *see also* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 1.04(A).

The ALJ noted that "[t]o meet Listing 1.04, a disorder of the spine must result in compromise of a nerve root or the spinal cord with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication." Tr. at 31. He concluded that Plaintiff's impairment did not meet Listing 1.04 because "MRI examinations failed to reveal any significant herniations, stenosis or nerve root impingement." *Id.* He further stated that he had considered the combined effect of Plaintiff's impairments and had determined that the findings related to them were not at least equal in severity to those described in Listing 1.04. *Id.* The ALJ subsequently cited the July 2013 MRI, but stated that it "revealed only mild reversal of the lumbar lordosis with mild grade I spondylolisthesis at the L2-3 level." Tr. at 32–33. He noted that Dr. Sonia Gill indicated the MRI showed "degenerative disc disease and advanced facet degeneration at L2-3, which was unchanged with moderate stenosis of the spinal canal"; "mild narrowing of the neural foramina"; "stable modest degenerative changes with no significant narrowing of the canal or foramina"; and "[s]table post-surgical changes" at the L4-5 and L5-S1 levels. Tr. at 33. He noted that Plaintiff had some midline tenderness in his lumbar spine when he presented to the ER in August 2013, but that he had good reflexes and normal sensation. *Id.* He noted the Charleston VAMC records showed Plaintiff to have decreased ROM of the lumbar spine and paraspinal tenderness, but normal strength and reflexes. *Id.*

Plaintiff points to specific evidence of record and argues that it supports a finding that his impairment meets Listing 1.04. [ECF No. 15 at 19, citing Tr. at 273 (diminished lumbar ROM, slight weakness of the right quadriceps indicating motor loss, and decreased ankle jerks suggesting reflex loss), 276–77 (July 2013 MRI findings), 470 (decreased range of motion of the lumbar spine with paraspinal tenderness), 486 (limited ROM in trunk and 4–4+/5 strength), 487 (decreased ROM of the lumbar spine, paraspinal tenderness, and prescription for a TENS unit to address pain complaints), 495 (slightly antalgic gait), 498 (difficulty with sitting from standing position), 507 (decreased ROM of the lumbar spine and paraspinal tenderness), 564–65 (cane prescribed for unsteady gait), and 609 (positive straight-leg raise test at 45 degrees on the right)]. In *Henderson*, 2016 WL 1320779, at *3, the Fourth Circuit considered a similar argument and found that the ALJ properly determined the plaintiff did not have the prerequisite findings of nerve root compression, including motor loss accompanied by sensory or reflex loss. The court noted that the plaintiff "produced no evidence of atrophy, and his evidence of muscle weakness—a lone clinical finding that his leg strength was '4+/5'—fails to undercut the substantial conflicting evidence in the record that his strength was consistently '5/5,' 'stable,' or 'normal.'" *Id.* Thus, the court found that the ALJ's conclusion that the plaintiff did not meet Listing 1.04 was supported by substantial evidence. *Id.*

Although Plaintiff can point to a singular assessment of 4–4+/5 strength, the majority of examinations in the record show him to have normal strength. *See* Tr. at 325 (assessing 5/5 bilateral lower extremity strength), 470 (finding normal strength and

31

reflexes), and 495 (indicating normal strength in extremities). As in *Henderson*, the record lacks evidence of atrophy. Furthermore, while Plaintiff references a record that shows him to have a positive straight-leg raising test on the right at 45 degrees, the record does not indicate that the straight-leg raising test was performed in both the sitting and supine positions, which are required to meet the Listing. *See* Tr. at 609; *see also* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 1.04(A). In light of the foregoing evidence and the Fourth Circuit's recent ruling in *Henderson*, the court finds that substantial evidence supported the ALJ's determination that Plaintiff's impairment did not meet or equal Listing 1.04.

### 4.    Ability to Perform PRW

Plaintiff argues the ALJ erred in determining that he could perform his PRW as a vascular lead technician as generally performed. [ECF No. 15 at 20]. He maintains the ALJ failed to comply with the provisions of SSR 82-62 because he did not make detailed findings regarding the physical and mental demands of his PRW. *Id.* at 21–22. He contends that the record contains no evidence as to how the job was generally performed in the economy and that the ALJ failed to cite to any particular *DOT* description to support his finding. *Id.* He further argues that his PRW was a composite job that included duties as an ultrasound technologist and a patient transporter. *Id.* at 24. He maintains that because the job of "patient transporter" is performed at the medium exertional level, the ALJ's finding that he could perform PRW was inconsistent with his RFC finding. *Id.* at 24–28. He contends that the ALJ considered only the exertional requirements of the part of the job that required less exertion. *Id.* He maintains that SSR 82-62 precludes an ALJ

from concluding that a claimant can perform his PRW without explaining his rationale and making specific findings as to the demands of PRW. [ECF No. 18 at 7].

The Commissioner argues that the ALJ did not err in finding that Plaintiff could perform his PRW as generally described in the *DOT*. [ECF No. 16 at 15]. She maintains that Plaintiff's PRW was not a composite job because its main duties did not require consideration of multiple occupations in the *DOT*. *Id.* at 15–16. She contends the ALJ considered all the criteria specified in SSR 82-62. *Id.* at 17.

A claimant will generally be found "not disabled" if his RFC allows him to meet the physical and mental demands of his PRW as actually performed or as customarily performed throughout the economy. SSR 82-62. "Past work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work." *Id.* To determine the claimant's ability to perform PRW, the ALJ must carefully evaluate the claimant's statements as to which PRW requirements can no longer be met and the reasons for his inability to meet those requirements; medical evidence establishing how the impairment limits the claimant's ability to meet the physical and mental requirements of the work; and in some cases, supplementary or corroborative information from other sources such as employers, the *DOT*, etc., on the requirements of the work as generally performed in the economy. *Id.* Because a determination as to whether a claimant can perform PRW is important and sometimes even controlling, it is very important that the ALJ make every effort "to secure evidence that resolves the issue as clearly and explicitly as circumstances permit." *Id.* The adjudicator must make the following specific findings

of fact to support a determination that the claimant can perform PRW: (1) a finding of fact as to the claimant's RFC; (2) a finding of fact as to the physical and mental demands of PRW; and (3) a finding of fact that the individual's RFC would permit a return to his PRW. *Id.*

The ALJ concluded that Plaintiff was capable of performing his PRW as a vascular lead technician. Tr. at 34. He found that Plaintiff worked as a vascular lead technician within 15 years prior to the time of adjudication of the claim, performed the job at the substantial gainful activity level, and performed the job for a sufficient period to have learned its techniques, acquired information, and developed the facility needed for average performance in the job situation. *Id.* He indicated that in comparing Plaintiff's RFC with the physical and mental demands of the job, he determined Plaintiff was able to perform the job as it was generally performed. *Id.*

Although the ALJ made findings of fact as to Plaintiff's RFC and determined that the RFC would permit a return to PRW, he neglected to identify the physical and mental demands of Plaintiff's PRW. *See* SSR 82-62. The *DOT* contains no description for "vascular lead technician." A claim communication signed by Adrian Ferguson ("Mr. Ferguson"), indicates "the best *DOT* job match [for Plaintiff's PRW] is Ultrasound Technologist 078.364-010 SVP 7 Light." Tr. at 58. However, the ALJ did not specifically find that Plaintiff could perform the job of ultrasound technologist, but instead found that Plaintiff was capable of performing his PRW as a vascular lead technician as the job is generally performed. *Compare* Tr. at 34, *with* Tr. at 58–59. In explaining his decision, the ALJ referenced Exhibit 1E, which is a work activity report in which Plaintiff identified

his PRW as a "vascular lead tech," but provided no details about the physical and mental requirements of the job. *See* Tr. at 197. The ALJ did not indicate that he considered the *DOT*'s description of ultrasound technologist[5] and did not explain how he determined that the job duties of Plaintiff's PRW were consistent with the RFC he assessed. *See generally* Tr. at 34. Furthermore, the ALJ did not solicit the services of a vocational expert to testify as to the exertional and nonexertional demands of Plaintiff's PRW. Because the ALJ did not find that Plaintiff could perform the light job of ultrasound technologist, but found that he could perform a job that was not listed in the *DOT*, the record lacks evidence as to how Plaintiff's PRW was customarily performed. Therefore, the ALJ's reliance on the description of the job as generally performed is misplaced.

In the absence of any indication from the ALJ that he relied on the *DOT* or any additional evidence of record at step four, the court should look solely to Plaintiff's description of his PRW. *See Boler v. Colvin*, No. 1:10-451, 2013 WL 5423647, at *3 (M.D.N.C. Sept. 26, 2013) (explaining that because the ALJ failed to classify the plaintiff's PRW based on *DOT* number, he was required to rely on the descriptions she provided in her vocational report and testimony), citing *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001); SSRs 82-41 and 82-61. Plaintiff described his PRW as requiring the use of machines, tools, or equipment; technical knowledge or skills; and writing, completing reports, and performing other similar duties. Tr. at 212. He indicated he was required to stand, walk, and reach for six hours per day; to stoop, crouch, handle large

---

[5] Because the ALJ did not find that Plaintiff's PRW was that of an ultrasound technologist, the undersigned declines to address the potential composite nature of Plaintiff's PRW.

objects, write, type, and handle small objects for four hours per day; to kneel for two hours per day; and to sit for one hour per day. *Id.* He stated that he lifted and carried equipment that weighed a maximum of 25–30 pounds, but that he frequently lifted 10 pounds. *Id.* Mr. Ferguson indicated that he spoke with Plaintiff to obtain a more detailed description of the job. Tr. at 59. He noted that Plaintiff described the duties of his PRW to include pushing patients that weighed 200 to 300 pounds in hospital beds. *Id.* Plaintiff indicated he lifted and carried a Doppler machine and often pushed items on a cart. *Id.* He stated he lifted a maximum of 75 to 80 pounds and frequently lifted 10 to 20 pounds. *Id.* During the hearing, Plaintiff testified that his PRW required leaning over patients, taking patients from point A to point B, and escorting patients from their bed to the chair. Tr. at 43. He indicated it involved constant pulling. Tr. at 47–48.

A comparison of Plaintiff's description of his PRW and the RFC assessed by the ALJ reveals several inconsistencies that render the ALJ's conclusion that Plaintiff could perform PRW unsupported by substantial evidence. *Compare* Tr. at 43, 47–48, 59, and 211–12, *with* Tr. at 32. Plaintiff indicated that his PRW required he frequently carry 10 to 20 pounds, occasionally carry up to 80 pounds, and push up to 300 pounds, but the ALJ found that Plaintiff could perform light work. *Compare* Tr. at 59, with 20 § C.F.R. 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."). Plaintiff stated his PRW required up to four hours per day of stooping and crouching, but the ALJ found that he was limited to occasional stooping and crouching. *Compare* Tr. at 212, *with* SSR 83-10 (defining "occasionally" as "occurring from very little up to one-third of the time").

36

These inconsistencies between the assessed RFC and Plaintiff's description of his PRW are indicative of a failure on the part of the ALJ to carefully evaluate Plaintiff's statements regarding the demands of his PRW. *See* SSR 82-62; *see also Breeden v. Astrue*, No. 5:11-110, 2012 WL 6547658, at *3 (W.D.Va. Dec. 12, 2012) (holding that the ALJ's step four finding was not supported by substantial evidence where he failed to consider the actual duties of the plaintiff's PRW and "[w]ithout any reference to the record . . . simply divined that as performed the plaintiff's past relevant work as a housekeeper entailed only a light level of exertion"). They suggest the limitations to light exertion and only occasional stooping and crouching would preclude Plaintiff from performing his PRW. In light of the evidence of record and the ALJ's failure to resolve Plaintiff's description of his PRW with the assessed RFC, the court finds that substantial evidence does not support the ALJ's step four finding.

### 5.     Subjective Symptoms and Credibility

Plaintiff argues the ALJ failed to cite specific reasons for discounting his statements as to the intensity, persistence, and limiting effect of his symptoms. [ECF No. 15 at 29–30]. He maintains that the MRI showed significant abnormalities and that the fact that his condition was stable did not mean that it was not disabling. *Id.* at 30. He contends that the ALJ's decision is devoid of discussion of the factors deemed relevant by 20 C.F.R. § 404.1529(c)(3). *Id.* at 30–31. He maintains that the ALJ failed to provide explicit reasons for rejecting his subjective complaints. [ECF No. 18 at 8].

The Commissioner argues that the medical evidence does not support Plaintiff's alleged functional limitations. [ECF No. 16 at 18–19]. She maintains that the ALJ's

assessment of Plaintiff's statements was supported by his daily activities and the opinions of the state agency physicians. *Id.* at 19.

In assessing symptoms such as pain, fatigue, shortness of breath, weakness, or nervousness, the ALJ must first "consider whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7p; *see also* 20 C.F.R. § 404.1529(a). After determining that the claimant has a medically-determinable impairment that could reasonably be expected to produce his alleged symptoms, the ALJ should evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the limitations they impose on his ability to do basic work activities. *Id.*; 20 C.F.R. § 404.1529(c)(1). If the claimant's statements about the intensity, persistence, or limiting effects of his symptoms are not substantiated by the objective medical evidence, the ALJ must consider his credibility in light of the entire case record. *Id.*; 20 C.F.R. § 404.1529(c)(4). The ALJ must consider "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* In addition to the objective medical evidence, ALJs should also consider the following when assessing the credibility of an individual's statements:

1.     The individual's daily activities;

2.    The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.    Factors that precipitate and aggravate the symptoms;

4.    The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.    Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.    Any measure other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.    Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.*; 20 C.F.R. § 404.1529(c)(3).

The ALJ must specify his reasons for the finding on credibility, and his reasons must be supported by the evidence in the case record. *Id.* The decision must clearly indicate the weight he accorded to the claimant's statements and the reasons for that weight. *Id.*

The ALJ concluded that Plaintiff's medically-determinable impairment could reasonably be expected to cause the alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of the symptoms were "not entirely credible for the reasons explained in this decision." Tr. at 32. The ALJ acknowledged that Plaintiff had a history of two spinal surgeries, but indicated the July 2013 MRI showed no particularly significant findings. Tr. at 32–33. He noted that Plaintiff presented to the ER after sustaining a fall while playing Frisbee in August 2013, but that x-rays showed no significant findings and his pain was controlled with Percocet. Tr. at 33. He observed

that progress notes from the Charleston VAMC demonstrated complaints of daily pain with activities like riding a bike, running or jogging, climbing stairs, and bending to pick up objects and observations of decreased ROM of the lumbar spine and tenderness in the paraspinal region, but that physical examinations generally revealed Plaintiff to be in no acute distress, to have normal strength and reflexes, and to have stable pain on Methadone. *Id.* He indicated the clinical findings suggested Plaintiff had a higher level of functioning than he reported, but that he had "taken into account some of the claimant's subjective complaints in limiting him to less than the full range of light work." *Id.* He stated that "[b]ecause the claimant's allegations of such significant limitations and pain were not fully consistent with the medical evidence of record," he could not find his allegations that he was incapable of all work activity to be credible. Tr. at 34.

Although the ALJ's decision reflects adequate consideration of many of the factors in 20 C.F.R. § 404.1529(c)(3) and SSR 96-7p, the ALJ neglected to consider several of the factors that were relevant to the evaluation of Plaintiff's pain, including the intensity of his pain, the effectiveness of his medication, and the methods of treatment that his doctors prescribed. Plaintiff indicated his pain was an eight on a 10-point scale. Tr. at 45 and 545. The record reflects that he admitted to using more Methadone than he was prescribed on multiple occasions and repeatedly requested that the medication be refilled early.[6] *See* Tr. at 328, 353, 364, 438, 443, 447–48, 449, 450–51, 456, 453, 514,

---

[6] The undersigned notes that Plaintiff informed his doctors on several occasions that he needed for his Methadone prescription to be filled early because he planned to be out of town for work. *See* Tr. at 438, 445, 448, and 514. In May 2014, Dr. Scalia indicated Plaintiff had explained his weight gain by stating that he was traveling a lot for work and eating salty foods. Tr. at 430. In July 2014, Plaintiff informed Dr. Scalia that he had

600, and 601. Plaintiff was treated with methods other than medication that included a TENS unit, a cane, and a Toradol injection. Tr. at 467, 486–87, 564–65, and 570. The physicians who reviewed Plaintiff's records at Dr. Scalia's behest recommended he engage in water therapy, cognitive behavioral therapy, and have his medications tapered. Tr. at 485–86 and 499–500. The ALJ ignored the aforementioned evidence, and merely concluded that Plaintiff's pain was stable on Methadone. Tr. at 33. In light of the foregoing, the court finds the ALJ did not adequately evaluate the intensity, persistence, and limiting effects of Plaintiff's symptoms in accordance with the provisions of 20 C.F.R. § 404.1529 and SSR 96-7p.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

June 17, 2016                                         Shiva V. Hodges
Columbia, South Carolina                  United States Magistrate Judge

---

sustained a fall while working in Chicago. Tr. at 505. Despite these statements, Plaintiff testified that he last worked in November 2013. Tr. at 43. While Plaintiff's earnings record reveals no work since November 2013 (Tr. at 173–93), the court recommends the ALJ examine Plaintiff's statements regarding his work activity on remand.